**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

UNITED STATES OF AMERICA, ex rel.,
MICHAEL R. WHITE and VINCENZA
WHITE,                                                       Case No.:

               Plaintiffs/Relators,

v.

EARLY CHILDHOOD AUTISM PROGRAM,
FLORIDA STATE UNIVERSITY-PANAMA
CITY, EMILY DICKENS as DIRECTOR,
EARLY CHILDHOOD AUTISM PROGRAM,
and, JENNIFER DAVIS

               Defendants.

_____/

**COMPLAINT PURSUANT TO THE**
**FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3730(b)(2))**

COMES NOW, UNITED STATES OF AMERICA, ex rel. MICHAEL R. WHITE and

VINCENZA WHITE (Plaintiffs/Relators) and hereby files this complaint against FLORIDA

STATE UNIVERSITY-PANAMA CITY EARLY CHILDHOOD AUTISM PROGRAM,

EMILY DICKENS as DIRECTOR, EARLY CHILDHOOD AUTISM PROGRAM, and,

JENNIFER DAVIS (collectively "Defendants") in accordance with the requirements of the False

Claims Act, 31 U.S.C. §3730(b)(2).

## I. INTRODUCTION AND SUMMARY OF ALLEGATIONS

1.     Relators placed their autistic son, J.W., into a program associated with Florida

State University-Panama City, the Early Childhood Autism Program (ECAP).

2.     Through the program, Relators had access to therapists for their autistic son.

ECAP, a non-profit/501(c)3, billed TRICARE.[1]

3.      Shockingly, despite overt representations that care was being rendered, for three of J.W.'s young formative years, no therapy was actually provided.  Instead, records were falsified and false claims were submitted to TRICARE.

4.      Young J.W. was left behind without the care he was due and promised and is suffering now and into the future due to years of ECAP's failure to provide therapy.  The damage done by withholding vital therapy during these formative years will never fully be recompensed or cured.

5.      More so, upon information and belief, J.W. was not the only child who failed to receive therapy from Defendant.

6.      Though the injustice to J.W. cannot be undone, the money paid to TRICARE under the false pretense that specialized care was being provided should and must be recovered.

## II. PARTIES

<u>Relators</u>

5.      Under the False Claims Act, a person or persons ("Relator(s)") with knowledge of false or fraudulent claims against the Government may bring an action on behalf of the federal government, state government(s), and themselves. Relators, Michael R. White and Vincenza White, are the original source of information within the meaning of the False Claims Act, 31 U.S.C. §3730(e)(4)(B) and submit this statement and supporting materials in advance of filing a complaint.

6.      Michael R. White and Vincenza White are residents of Panama City, Florida. Mr. White is a retired United States Navy Chief Petty Officer (CPO) who served on active duty

---

[1] At all times material to this complaint, medical insurance coverage was provided to Relators and their child through TRICARE by virtue Michael R. White's prior military service.

twenty-six years and is a 100% disabled combat war veteran. Mrs. White is a physical therapy assistant. The Relators reside at 528 JH Crews Circle, Panama City, Florida.

Defendant

7.      Early Childhood Autism Program, Florida State University-Panama City, is a non-profit (501(c)3) early intervention and community outreach program whose stated mission is to provide a variety of services to those individuals suffering from ASD.  The ECAP is the only ABA program in the Panhandle to provide in-home and in-clinic services.

8.      Per the ECAP website[2] they provide:   individualized ABA therapy under supervision of Board Certified Behaviour Analysts (BCBAs); direct one-on-one teaching; functional analyses of problem behaviours; ongoing data collection to evaluate treatment effects; continuous program monitoring; parent training/consultations; and workshops.

9.      The program lists an address of 4750 Collegiate Drive, Panama City, Florida.

10.     The Director of ECAP is Emily (Nikki) Dickens. Upon information and belief, Ms. Dickens, a resident of the state of Florida, became director of the ECAP in July, 2017.

11.     Jennifer Davis was previously employed by ECAP as a therapist. Upon information and belief, Ms. Davis was a resident of the state of Florida during the relevant time period.

**III. JURISDICTION AND VENUE**

12.     Relator has made voluntary disclosures to the government prior to the filing of this lawsuit as required by 31 U.S.C. §3730(b)(2).

13.     This Court has jurisdiction over this case and venue is proper pursuant to 31 U.S.C. § 3732 (a) and 28 U.S.C. §1391, as well as under 28 U.S.C. § 1345. The acts complained of herein, and proscribed by 31 U.S.C. § 3729 et seq. occurred in the Northern District of Florida

---

[2] http://pc.fsu.edu/about-us/grade-school-programs/ecap

as Defendant ECAP exists in and transact business in the Northern District of Florida, Defendant Emily Dickens resides and transacts business in the Northern District of Florida, and Defendant Jennifer Davis resided and transacted business in the Norther District of Florida during the relevant time period.

14.     The facts and circumstances alleged in this complaint have not been publicly disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative, or government accounting office report, hearing, audit investigation, or in the news media.

15.     Relators are an "original source" of the information upon which this complaint is based, as that term is used in the False Claims Acts relied on herein and have otherwise complied with all conditions precedent to bringing this action.

## IV. NATURE OF THE CASE

16.     At just two months of age, J.W. came down with a fever reaching up to 103 degrees. Relators took him to the Emergency Room where he received extensive care and, eventually, a spinal tap to rule out meningitis. After two days of treatment and testing he was released.

17.     At his first visit, J.W.'s physician asked Relators if they wanted to participate in a research study through the First Word Project, administered by the Center for Autism and Related Disabilities (CARD) in Tallahassee, Florida.

18.     In November 2009, J.W. was officially diagnosed with Autism Spectrum Disorder (ASD) to the shock of Relators, who had no idea what to expect as J.W. grew.

19.     From the date of their son's diagnosis, Relators started their mission to ensure he received the maximum amount of hours of therapies, such as speech, occupational, music and, primarily, Applied Behavioral Analysis (ABA) therapy, so that he could develop into a

functional young man. These therapies were initially provided by the State of Florida's Early Steps Program and were to be provided until he turned three years old.

20.      Behavior analysis focuses on the principles that explain how learning takes place. Positive reinforcement is one such principle. When a behavior is followed by some sort of reward, the behavior is more likely to be repeated. Through decades of research, the field of behavior analysis has developed many techniques for increasing useful behaviors and reducing those that may cause harm or interfere with learning.

21.      ABA techniques can be used in structured situations such as a classroom lesson as well as in "everyday" situations such as family dinnertime or the neighborhood playground. Some ABA therapy sessions involve one-on-one interaction between the behavior analyst and the participant. Group instruction can likewise prove useful.

22.      A number of completed studies have demonstrated that ABA techniques can produce improvements in communication, social relationships, play, self-care, school and employment. These studies involved age groups ranging from preschoolers to adults. Results for all age groups showed that ABA increased participation in family and community activities. A number of peer-reviewed studies have examined the potential benefits of combining multiple ABA techniques into comprehensive, individualized and intensive early intervention programs for children with autism. "Comprehensive" refers to interventions that address a full range of life skills, from communication and sociability to self-care and readiness for school.

23.      "Early intervention" refers to programs designed to begin before age 4. "Intensive" refers to programs that total 25 to 40 hours per week for 1 to 3 years. These programs allow children to learn and practice skills in both structured and unstructured situations. The "intensity" of these programs may be particularly important to replicate the thousands of

interactions that typical toddlers experience each day while interacting with their parents and peers.

24.     The parents of the children who receive intensive ABA report greater reductions in daily stress than do parents whose children receive other treatments.[3]

25.     Relators began intensive research to identify programs in the Panama City, Florida, area where ABA therapy was offered. Relators were able to assure their son received ABA therapy through the State of Florida Health Department's Early Steps Program (ESP) which he received until the age of three. During his participation in the ESP, Melissa Brewer was assigned as J.W.'s ABA therapist.

26.     From March 2012 until approximately October 2012, and from October 2014 to the present, J.W. was provided therapy by the ECAP.

27.     Beginning in March 2012, their son began receiving ABA therapy through the ECAP. J.W. continued therapy in the ECAP until Relators learned that Melissa Brewer had left the ESP and was in private practice.

28.     In October 2012, Relators switched their son over to Melissa Brewer's private practice where they felt he would receive the therapy he needed based on their previous interaction with her in the ESP. Melissa Brewer developed a treatment plan for J.W. that addressed communication skills, social interaction, learning to play with peers, attention and focusing, proper manners, emotional control and non-typical behavior reduction. As a result of Melissa Brewer's efforts and treatment plan, J.W. made progress at an above average pace. In less than a year Relators son was developing at a tremendous rate and was making exceptional gains.

29.     In October 2014 Melissa Brewer discontinued her private practice due to family

---

[3] https://www.autismspeaks.org/what-autism/treatment/applied-behavior-analysis-aba

matters, and Relators returned to the ECAP. Upon their return, ECAP Employee Jennifer Davis was assigned to Relators son's case as his ABA therapist.

30.     During the initial period with Jennifer Davis, Relators observed that she was not active in her therapy methods and on numerous occasions they voiced concern to program administrators and Ms. Davis about their son's development and needs.

31.     Jennifer Davis told Relators that she would change treatment plans to address any issues, however, J.W.'s behavioral problems escalated and his functional skills were obviously diminishing and continued to do so during his ABA therapy purportedly provided by Jennifer Davis.

32.     In April 2017 Relators placed their son on a waiting list with a new provider as he was not making any progress and had, in fact, regressed during his time with Jennifer Davis.

33.     On August 31, 2017, Relators attended a meeting at J.W.'s school, St. John's Catholic School in Panama City, Florida, which included Principal Vicki Parks, a teacher named Michelle Brown, a paraprofessional educator named Dorothy Belton who is paid by Relators as an out-of-pocket expense, and JW's therapist Jennifer Davis. During this meeting, Jennifer Davis proposed removing Relator's son from the classroom in order to provide one-on-one therapy to JW and training for Dorothy Belton.

34.     On October 17, 2017, Realtors had a follow-up meeting with Dorothy Belton at which time she revealed to them that Jennifer Davis, and Ms. Davis' assigned FSU-ECAP graduate students, were not training her during the one-on-one time and were primarily working on inter-verbal questions with their son. Relators had previously expressed their concern and dislike of this method as the primary learning system for their son over the previous two years, as it did not seem to be effective.

35.     Subsequent to their meeting with Dorothy Belton, Relators confronted Jennifer Davis, who now started to include Dorothy Belton during the one-on-one time with their son, but did not provide training to her and reverted back to only working on inter-verbal questions, even though the Relators could see that this was not effective therapy.

36.     On November 27, 2017, Relators received a telephone call from the ECAP program director, Emily Dickens, informing them that Jennifer Davis was no longer working in the ECAP and that their son James would be assigned a new provider. During that conversation, Relators requested a meeting with the new therapist, which was subsequently scheduled to be held on December 6, 2017.

37.     The December 6, 2017, meeting was attended by Emily Dickens; Marian Dodd, the training coordinator; Summer Livingston, the new therapist; Heather Sass, an analyst; and two of the graduate-program students assigned to J.W.'s case, Skyla and Clara (last names unknown).

38.     At the beginning of the meeting, Relators learned that Jennifer Davis had been terminated. Emily Dickens told Relators that she was "sorry for what happened." Emily Dickens continued to explain the circumstances behind Jennifer Davis's termination, informing Relators that Davis had been falsifying their son's treatment records, misleading the Relators on their son's progress, and lying to the administrators and staff of the ECAP.

39.     Relator Michael White specifically asked Emily Dickens whether his son received progressive and adequate ABA therapy over the three years prior. She responded, "No. He did not."

40.     Emily Dickens explained to Relators that she noticed problems with Jennifer Davis' work starting in July 2017 when she, Emily Dickens, had taken over as the director of the

ECAP. Ms. Dickens further explained that graduate-program students assigned to their son's case had been complaining about not receiving guidance from Jennifer Davis and that she would never allow them to work on treatment reports.

41.     Ms. Dickens also told Relators that every time Jennifer Davis was to be evaluated by her supervisor at Relators' residence, Jennifer Davis claimed the Relators were "reluctant" to have anyone in their home, which could not have been further from the truth.

42.     During this meeting Relators brought up the fact that Jennifer Davis constantly used the inter-verbal method of therapy even after Relators had complained of its ineffectiveness. The staff present at the meeting responded that, "Yes, that's because she was lazy and it was the easiest method to work on and to report on."

43.     As the meeting continued, Emily Dickens revealed that she had gone back and looked at previous reports required by TRICARE, and filed by Jennifer Davis, and had found that the reports had been falsified to reflect that J.W. was progressing and making gains when the opposite was true.

44.     TRICARE relied on these falsified reports to reimburse and approve additional treatment.  The total amount of TRICARE expenditures based on falsified documentation total approximately $220,000.00.

45.     At this time it is unknown how many other victims of this scheme exist but, upon information and belief, Jennifer Davis treated or billed for treating several other students, many of whom are likely covered by government insurance.

46.     On January 11, 2018, Relators learned that their son would not be able to continue enrolment at his present school due to disruptive behaviors that were caused by the lack of ABA therapy J.W. during the last three years. At the present time there is no school in the Panama City

area where their son can attend, forcing them to research the very limited options available to them.

47.     The effect of the lack of therapy on J.W. as he grows from an adolescent to an adult is unpredictable. He has already missed three years of milestones, important to any child but especially an autistic child.

48.     To date, TRICARE has fraudulently been billed for services not rendered, totaling approximately $220,000.00 due to the falsification of treatment documentation that was submitted to TRICARE for payment by ECAP.

49.     The bills for the services purportedly provided by Jennifer Smith and the ECAP program were submitted to TRICARE under Above All Florida State, NPI number 1306014105.

### V. TRICARE

50.     TRICARE is a federal program, established by 10 U.S.C. §§ 1071-1110, and 32 C.F.R. §§ 199.17 that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents.

51.     Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. *See* 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, et seq.).

52.     Like Medicare, TRICARE will pay for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." *See* 32 C.F.R. § 199.4(a)(1)(i). And, like the Medicare Program and the Medicaid Program, TRICARE prohibits practices such as submitting claims for services that are not actually provided. *See* 32 C.F.R.

§§ 199.9(c)(1).

53.     Specifically, TRICARE regulations define fraud as submitting TRICARE claims for services not furnished to a TRICARE beneficiary; misrepresenting the dates, frequency, duration, or description of services rendered; submitting falsified TRICARE claims or medical records misrepresenting the type, frequency, or duration of the services provided to the patient. 32 C.F.R. §§ 199.2, 199.9(c)(1), (6), (7).

54.     TRICARE regulations further provide "[i]t is presumed that if a deception or misrepresentation is established and a [TRICARE] claim is filed, the person responsible for the claim had the requisite knowledge. . . . [and] that the provider of the services is responsible for the actions of all individuals who file a claim on behalf of the provider . . . ." 32 C.F.R. § 199.2.

55.     The remedies for such violations include, but are not limited to, provider exclusion or suspension under TRICARE and restitution. 32 C.F.R. §§ 199.9(f)(1)-(5). *See also* 42 U.S.C. §§ 1395u(l)(3), 1395(gg), 1395l(j) (CMS entitled to recoupment for overpayments plus interest where the overpayment resulted from improper billing).

56.     As another condition to participation in the Medicare and TRICARE Programs, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for reimbursement.   42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. *See also* 42 C.F.R. §§ 489.40, 489.31.  In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony.

## VI. THE FALSE CLAIMS ACT

57.     The FCA, as amended, provide in pertinent part that:

[A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes

to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990...plus 3 times the amount of damages which the Government sustains because of the act of that person.

U.S.C. § 3729(a)(1).

58.     The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

## VII. FALSE BILLINGS TO TRICARE

59.     During the time period of October 2014 through the present, the following false claims were presented to, and paid by, TRICARE.   This is best evidenced by the Summary of Explanation of Benefits provided to Relators.  Each of the below amounts reflect violations of the False Claims Act, in which J.W. did not receive the therapy TRICARE paid for and for which false medical records were provided in support of:

| Claims Processing Period | Amount Paid to ECAP |
| --- | --- |
| 10/11/14 - 11/10/14 | $3,018.00 |
| 1/10/15 -2/10/15 | $1,416.00 |
| 2/11/15 – 3/10/15 | $2,736.30 |
| 3/11/15 – 4/10/15 | $1,428.00 |
| 4/11/15 – 5/8/15 | $2,755.00 |
| 5/9/15 – 6/10/15 | $8,712.00 |

| | |
|---|---|
| 6/11/15 – 7/10/15 | None |
| 7/11/15 – 8/10/15 | $4,582.42 |
| 8/11/15 – 9/10/15 | $4,250.00 |
| 9/11/15 – 10/9/15 | None |
| 10/10/15 – 11/10/15 | None |
| 11/15/15 – 12/10/15 | $8,828.50 |
| 12/11/15 – 1/8/16 | None |
| 1/9/16 – 2/10/16 | $15,519.50 |
| 2/11/16 – 3/10/16 | $5,996.00 |
| 3/11/16 – 4/8/16 | $5,533.00 |
| 4/9/16 – 5/10/16 | None |
| 5/11/16 – 6/10/16 | $7,717.43 |
| 6/11/16 – 7/8/16 | $5,734.87 |
| 7/9/16 – 8/10/16 | $6,595.69 |
| 8/11/16 – 9/9/16 | $5,362.72 |
| 9/10/16 – 10/10/16 | $7,066.29 |
| 10/11/16 – 11/10/16 | $5,428.53 |
| 11/11/16 – 12/9/16 | $4,995.84 |
| 12/10/16 – 1/10/17 | None |
| 1/11/17 – 2/10/17 | $12,319.20 |
| 2/11/17 – 3/10/17 | $8,448.00 |
| 3/11/17 – 4/10/17 | $8,259.50 |
| 4/11/17 – 5/10/17 | $10,473.50 |
| 5/11/17 – 6/9/17 | $14,702.22 |
| 6/10/17 – 7/10/17 | $10,687.50 |
| 7/11/17 – 8/10/17 | $17,862.50 |
| 8/11/17 – 9/8/17 | $11,625.00 |

| 9/9/17 – 10/10/17 | $9,287.50 |
|---|---|
| 11/11/17 – 12/8/17 | $7,762.50 |
| **TOTAL PAID BY TRICARE** | **$219,103.01** |

### FIRST CAUSE OF ACTION
### (False Claims Act: Presentation of False Claims)
### (31 U.S.C. § 3729(a)(1)(A))

60.    Relator repeats and incorporates by reference the above allegations of this Complaint as if fully set forth herein.

61.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).  Despite being made aware by Relators that Jennifer Davis was not providing ABA therapy, Defendants nonetheless submitted bills to TRICARE for said services.

62.    The United States, or its authorized agent, paid the false and/or fraudulent claims.

63.    Had the United States known that the therapies purportedly provided by therapist Jennifer Davis were not, in fact provided, it would have refused to authorize payment for those services billed for by Defendants.

64.    Had the United States known that the patient charts supporting bills submitted to the government for therapies purportedly provided by therapist Jennifer Davis were, in fact, false and fabricated, it would have refused to authorize payment for those services billed for by Defendants.

65.    By virtue of the false or fraudulent claims Defendants knowingly caused to be presented, the United States has suffered substantial monetary damages.

## SECOND CAUSE OF ACTION
### (False Claims Act: Making or Using False
### Record Statement to Cause Claim to be Paid)
### (31 U.S.C. § 3729(a)(1)(B))

66.     Relator repeats and incorporates by reference the above allegations of this Complaint as if fully set forth herein.

67.     As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendants knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications, invoices, medical records and reports required by TRICARE made or caused to be made by Defendants – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

68.     The United States relied upon the false record or statement in making a decision to pay Defendants.  Had the United States known that the certifications, invoices, medical records and reports required by TRICARE submitted to the government for therapies purportedly provided by therapist Jennifer Davis were, in fact, false and fabricated, it would have refused to authorize payment for those services billed for by Defendants.

69.     By virtue of the false or fraudulent claims Defendants knowingly caused to be presented, the United States has suffered substantial monetary damages.

## DEMANDS FOR RELIEF

WHEREFORE, Relator, on behalf of the United States of America, demands judgment against the Defendant, ordering that:

a.    Pursuant to 31 U.S.C. § 3729(a), Defendant pays an amount equal to three times the amount of damages the United States of America has sustained because of Defendant's action, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*;

b.    Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3729(d) of the False Claims Act and/or any other applicable provision of law;

c.      Relators be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3729(d) and any other applicable provision of the law; and;

d.      Relators be awarded such other and further relief as the Court may deem to be just and proper.

**TRIAL BY JURY**

Relator hereby demands a trial by jury as to all issues.

Dated April 4, 2018.

Respectfully submitted,

BY: _____

James D. Young (FBN 567507)
jyoung@forthepeople.com
Sarah A. Foster (*pro hac vice to be filed*)
sarahfoster@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
76 S. Laura Street, Suite 1100
Jacksonville, FL 32202
(904)361-0012 Telephone
(904)366-7677 Facsimile

*Attorneys for Plaintiffs/Relators*



PEEL HERE ▶

Align top of Fed

**FedEx**

From: (813) 318-5169
MAILROOM
Morgan & Morgan
201 N Franklin St
7th Floor
Tampa, FL 33602

Origin ID: KYOA

**FedEx** Express

Ship Date: 04APR18
ActWgt: 1.0 LB
CAD: 4227725/FXRS1409

Delivery Address Bar Code

SHIP TO: (850) 521-3501
**Clerk's Office**
**U.S. District Court, ND FL**
**111 N. Adams St.**

Tallahassee, FL 32301

BILL SENDER

Ref #    8118024
Invoice # 8118024
PO #
Dept #   Mass Tort

THU - 05 APR 10:30A
PRIORITY OVERNIGHT

TRK#  6259 7693 5546
0241

**XH TLHA**

32301
FL-US
TLH

http://orl-pb01/sendsuite%20live/projects/image.aspx?pd=1

4/4/2018

*The World On Time®*

# Large